ACCEPTED
06-15-00037-cr
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
8/5/2015 1:38:01 PM
DEBBIE AUTREY
CLERK

**ORAL ARGUMENT REQUESTED**

**NO. 06-15-00037-CR**

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
8/5/2015 1:38:01 PM
DEBBIE AUTREY
Clerk

**In the Sixth Court of Appeals
Texarkana, Texas**

---

**THE STATE OF TEXAS, Appellant**

**V.**

**ERICA LYNN FULLER, Appellee**

---

**On Appeal from the 6th Judicial District Court
Lamar County, Texas; Trial Court Cause No. 25545;
Honorable Eric Clifford, Judge**

---

# BRIEF OF APPELLEE

---

THE MOORE LAW FIRM, L.L.P.
James R. Rodgers
State License #17136300
Judy Hodgkiss
State License # 17136525
100 N. Main Street
Paris, Texas 75460
Telephone 903/784-4393
Facsimile 903/783-0042

**ATTORNEYS FOR APPELLEE,
ERICA LYNN FULLER**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Tex. R. App. P. 38.1(a), the identity of parties, along with the names and addresses of all counsel, is the following:

| | |
|---|---|
| The State of Texas<br>Lamar County & District Attorney's Office<br>Lamar County Courthouse<br>119 North Main Street<br>Paris, Texas 75460 | *Appellant* |
| Jill Drake and Laurie Pollard<br>Lamar County & District Attorney's Office<br>Lamar County Courthouse<br>119 North Main Street<br>Paris, Texas 75460 | *Attorneys for The State of Texas* |
| Gary D. Young<br>County and District Attorney<br>Lamar County Courthouse<br>119 North Main Street<br>Paris, Texas 75460 | *County and District Attorney* |
| Jeffrey W. Shell, *Attorney Pro Tem*<br>Attorney & Counselor at Law<br>2085 Berkdale Lane<br>Rockwall, Texas 75087 | *Attorney for the State of Texas* |
| Erica Lynn Fuller<br>% The Moore Law Firm, L.L.P.<br>100 North Main Street<br>Paris, Texas 75460 | *Appellee* |
| James R. Rodgers<br>Judy Hodgkiss<br>The Moore Law Firm, L.L.P.<br>100 North Main Street<br>Paris, Texas 75460 | *Attorneys for Appellee* |

# TABLE OF CONTENTS

              **Page**

IDENTITY OF PARTIES AND COUNSEL ................................................ i

TABLE OF CONTENTS .................................................................. ii

INDEX OF AUTHORITIES ............................................................. iii

STATEMENT REGARDING ORAL ARGUMENT ................................. iv

REPLY TO ISSUES PRESENTED .................................................... v

INTRODUCTION ......................................................................... 1

STATEMENT OF FACTS ................................................................ 2

SUMMARY OF THE ARGUMENT .................................................. 15

ARGUMENT AND AUTHORITIES ............................................... 19

PRAYER .................................................................................... 32

CERTIFICATE OF COMPLIANCE ............................................... 33

CERTIFICATE OF SERVICE ....................................................... 34

# INDEX OF AUTHORITIES

*Cases*                                                                          *Page*

*Adelman v. State*, 828 S.W.2d 418 (Tex.Crim.App. 1992)...................... 16, 29

*Adames v. State,* 353 S.W.3d 854 (Tex.Crim.App. 2011).......................... 30

*Bailey v. State,* 855 S.W.2d 193 (Tex.App. - Dallas 1994)....................... 25

*Christensen v. State*, 230 S.W.3d 75 (Tex.App. - Houston [1st Dist.] 2007). 26

*Cueva v. State*, 339 S.W.2d 839 (Tex.App. - Corpus Christi 2011)............ 27

*Freeman v. State*, 707 S.w.2d 597 (Tex.Civ.App. 1986)........................... 20

*Gold v. State*, 736 S.W.2d 865 (Tex.Crim.App. 1987)................................ 29

*Huff v. State,* 897 S.W.2d 829 (Tex.App. - Dallas 1995)...................... 18, 20, 24, 25

*Minter v. State,* 26 Tex.App. 217, 9 S.W. 561........................................... 22

*Newman v. State*, 115 S.W.3d 118 (2003)................................................. 20

*Rosenbush v. State*, 136 Tex.Crim.. 50 (1938)........................................... 22

*Stewart v. State*, 44 S.W.3d 582 (Tex.Crim.App. 2001).............................. 23

*Tesoro Refining & Marketing Co., LLC v. National Union Fire*................. 23
 *Ins. Co. of Pittsburgh, Pennsylvania, -* F.Supp. 3d - 2015 WL 152943.

*Wirtz v. State*, 361 S.W.3d 694 (Tex.Crim.App. 2012)............................... 26

## STATUTES

*Tex.Cr.Code Ann § 31.03(a)*................................................................. 19

*Tex.Penal Code § 31.01*................................................................... 19, 26

## STATEMENT REGARDING ORAL ARGUMENT

The Appellee, Erica Lynn Fuller requests oral argument. Oral argument would assist in applying the law to the facts in this case.

**<u>REPLY TO ISSUE PRESENTED</u>**

**<u>ISSUE PRESENTED IN REPLY TO SOLE ISSUE</u>: THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN GRANTING FULLER'S MOTION FOR NEW TRIAL AS THE EVIDENCE WAS LEGALLY INSUFFICIENT.**

**NO. 06-15-00037-CR**

_____

**In the Sixth Court of Appeals**
**Texarkana, Texas**

_____

**THE STATE OF TEXAS, Appellant**

**V.**

**ERICA LYNN FULLER, Appellee**


_____

**On Appeal from the 6th Judicial District Court**
**Lamar County, Texas; Trial Court Cause No. 25545;**
**Honorable Eric Clifford, Judge**

_____

# BRIEF OF APPELLEE
_____

**TO THE HONORABLE SIXTH COURT OF APPEALS**
**AT TEXARKANA:**

COMES NOW, Erica Lynn Fuller, by and through her attorney of record,

James R. Rodgers, and files this Brief of Appellee under Rule 38.2 of the Texas Rules

of Appellate Procedure.

# STATEMENT OF FACTS

The alleged theft occurred on December 31, 2010. The audit investigation that is referenced throughout this case occurred in January, 2011.

Throughout the testimony the nursing home is referred to alternatively as Brentwood, Parkview, or Diversicare. Originally the nursing home was known as Parkview. It later became known as Brentwood Terrace Nursing Home and Rehab. Diversicare is the corporation that bought the facility. (RR, Vol. 4, p. 45; Vol. 5, p. 7). At the times relevant to this incident, Ruth Brown (Brown) was the administrator of Brentwood. Melissa Neisler (Neisler) was the business office manager. (RR, Vol. 4, p. 41). Erica Fuller's (Fuller) job was to oversee the account that Brentwood set up which is referred to as the "trust fund". Fuller's duties also included sending invoices into corporate that are properly coded for payment. Fuller had no check writing authority on the account referred to throughout the trial as "operations". (RR, Vol. 5, pp. 15-16). Other than making deposits, Fuller had nothing to do with the operations side or operations account. (RR, Vol. 5, pp. 15-16). In fact, one person dealt with the residents' account (Trust - Fuller) and one dealt with the operations account (Neisler). (RR, Vol. 4, p. 140-141).

Angie Styles (Angie Whipkey) was the receptionist. The receptionist handled money that came into the facility that was either put into the trust fund or the

operations fund. It was the receptionist who had the duty of giving the appropriate receipt for the transaction. (RR, Vol. 4, pp. 52, 53, 114, 125).

The system that was utilized at Brentwood had a lot of money going through it on a daily basis. (RR, Vol. 4, p. 177). On a daily basis, money was coming in, going out, with money moving from one account to another. (RR, Vol. 4, p. 178). For instance, some of the residents' room and board was paid from the trust fund and some of the residents' room and board was paid from the operations account. (RR, Vol. 4, p. 178). As to some of the individuals, room and board would be paid from one account and on other occasions, the room and board would be paid from a different account. (RR, Vol. 4, p. 179). The accounts being referenced are generally referred to as the trust account and the operations account. Often, Brentwood would write itself a check from one account and deposit it into another account to reimburse itself for room and board on a resident. (RR, Vol. 4, p. 179). In these situations, a check would be written on the trust account and deposited into the operations account. It was not an unusual situation for a check to move from the trust account to the operations account so as to pay the room and board of a resident. It was admitted that there can be discrepancies in this system. (RR, Vol. 4, pp. 179-180). In fact, DADS conducted an audit and found some deficiencies. However, these were common and the type of deficiencies found had happened before and have happened

since this situation. (RR, Vol. 4, p. 180).

It was learned in the trial that the receptionist Styles (Whipkey) had made many errors in her receipting. In fact, it was acknowledged that almost all of the receipts prepared during this time period by Whipkey were incorrect. (RR, Vol. 4, pp. 165-166).

Brown admitted that Whipkey in reference to the receipts had done "a lot wrong". One of the problems with Whipkey was that she was not always checking whether it was cash being brought in or checks being brought in to which a receipt was given. Brown acknowledged that this was a "big deal" in not getting it straight whether cash or check was brought into the facility. (RR, Vol. 4, p. 187). In fact, it was shown that Whipkey repeated this error multiple times even in regard to the same resident. (RR, Vol. 4, pp. 188-189). Brown acknowledged that the facility never retrieved the checks or followed up with the residents or their families to determine if payments were made by cash or check as part of its investigation in this matter. (RR, Vol. 4, p. 190). The facility based its audit upon Whipkey's word that she had turned everything over properly. (RR, Vol. 4, p. 193). Brown acknowledged that the audit was based upon Whipkey even though almost every receipt done by Whipkey was incorrect. (RR, Vol. 4, p. 193).

Whipkey testified that the days were often very busy with thirty or more people

making cash payments. She described the situation as "hectic". (RR, Vol. 4, pp. 236-237). She also described that she felt that there were "lots of distractions". (RR, Vol. 4, p. 253).

Whipkey described the system stating that sometimes there were distributions out of the trust fund in which money would be going out but the receipts that she prepared sometimes showed money coming in instead. Whipkey acknowledged that sometimes she got the process reversed. (RR, Vol. 4, pp. 259-260).

The system utilized by Brentwood could best be described as follows: when money would come in, it would have to be classified as either going into the trust fund or to the operations side. (RR, Vol. 4, pp. 178-180). Social Security checks would come to the facility. Some of the checks went into the trust fund and some went into the operations account. (RR, Vol. 4, p. 178). If funds were owed to the facility, then actual data entry was made into the accounts receivable trust fund system. (RR, Vol. 5, p. 20). Then, whatever was due the facility was paid to the facility. This might require a check from the trust fund being paid into the operations fund. (RR, Vol. 5, p. 21). In that situation, the facility would deposit money into the operations account to pay various bills of the residents. (RR, Vol. 4, p. 179). The check would be written from the trust fund to be put into the operations account, and at that time, the check would be scanned into the operations account. (RR, Vol. 5, p.

21). Fuller would write the check from the trust fund to the operations fund. (RR, Vol. 5, p. 25). Fuller did not have the authority to write checks from the operations fund, and therefore, once money went into the operations fund, she had no control or access to those funds. (RR, Vol. 5, pp. 14-16).

The trust fund would have multiple transactions that would take place. Residents could withdraw minor amounts for personal needs. (RR, Vol. 4, p. 56). Or, in some situations, the facility would write itself a rather large check from the trust fund to reimburse itself for the residents whose room and board were paid for through the trust fund. However, to complicate the situation, some residents' room and board was paid from the operations fund, depending upon the nature of the funds. (Vol. 4, pp. 178-180).

All of the cash that came into the facility was receipted by Whipkey. Whipkey would "answer the phone, greet families, receipt trust and AR." (RR, Vol. 4, p. 234). Whipkey took care of three receipt books. (RR, Vol. 4, pp. 235, 259). Whipkey did all of the receipting of all of the checks that would come to the front as well. (RR, Vol. 4, p. 259). The three receipt books all looked identical. (RR, Vol. 4, pp. 115, 266).

As acknowledged by the State in its brief, Whipkey "got the receipts really mixed up in the books". (RR, Vol. 4, p. 251). According to Fuller's job description,

she was in accounts payable. (RR, Vol. 4, p. 122). However, the accounts payable portion of her job was limited to sending the invoices into corporate for payment. Fuller did not have access to the operations side to make the payments. Neisler described it as having two accounts, operations and trust. (RR, Vol. 4, p. 43). Brown described it that Fuller did entries on the trust account side and Glenda Neisler (Melissa Neisler's daughter) did entries on the operations side. Brown testified, as follows:

> "And you had one person that just dealt with the residents' accounts, the residents' trust fund and their personal accounts, and then you had the other person that actually dealt with the operations.

Q. Okay.

A. - account.

(RR, Vol. 4, pp. 140-141).

Fuller did make deposits for the trust and the operations side. (RR, Vol. 4, p. 46). Fuller handled receivables, accounts payable and payroll. However, the accounts payable was limited to approving invoices and sending them into corporate for payment. (RR, Vol. 4, p. 124).

Fuller had worked at the facility for several years prior to the incident the subject of this allegation. In August of 2010, Brown became the administrator at Brentwood. Brown gave Fuller poor job performance appraisals. (RR, Vol. 4, p.

173).

The job performance appraisals by Brown were markedly different than those that Fuller had received under the previous administrator for several years. The previous administrator, Norma Vinters, had praised Fuller's job performance and described her as an excellent employee. In fact, her performance appraisals were exemplary. (RR, Vol. 4, pp. 168-171; Defendant's exhibits 4, 5 and 6). The previous administrator in describing Fuller's excellent performance noted: "Even though Erica's new to bookkeeping, strong desire, great person to work around, still learning but always willing to help". (RR, Vol. 4, p. 172).

Apparently, in January of 2011 Brown contacted corporate that the petty cash box did not reconcile. (RR, Vol. 4, p. 149). Fuller and Whipkey were suspended pending the investigation. (RR, Vol. 4, pp. 150-151). They were suspended because of access to the petty cash box. (RR, Vol. 4, p. 152). Brown contacted Caryon Miller (Miller) who was described as "regional financial specialist" from Brentwood's corporate office. (RR, Vol. 4, pp. 149-153). Miller conducted the investigation and Brown deferred to Miller in all respects in regard to the accounting and/or investigation.

Brown acknowledged that she could not place a single dollar having been taken by Erica Fuller but deferred to Miller in that regard. (RR, Vol. 4, p. 176).

Miller was not an accountant, certified public accountant, or auditor. Miller had no accounting background except for several classes. (RR, vol. 5, pp. 7, 45). Miller acknowledged that Erica Fuller had nothing to do with the accounts receivable or the operations side other than sending invoices in for payment. (RR, Vol. 5, p. 16). Fuller would have made the deposits into the account. (RR, Vol. 5, p. 16). The operations account was in an out of the state bank and Erica Fuller would have nothing to do with the computer part of that other than making deposits. (RR, Vol. 5, p. 16).

Miller testified that if a resident's family put $500.00 into his/her trust fund that was to be used for the resident's room and board. That money would be deposited into the trust fund and then a check would be written to Brentwood from the trust fund that would then be put into the operations fund of Brentwood. (RR, Vol. 5, pp. 19-20). Therefore, there would be many occasions where a resident's room and board would be paid for out of the trust fund account. The bookkeeper, Fuller, would write the check from the trust fund to the operations fund. Actually, Fuller would write the check but someone else would be required to sign it. (RR, Vol. 5, p. 25). Glenda Neisler was on the operations side. (RR, Vol. 5, p. 26). On the disbursement sheet, each resident's name and the amount that was to be applied to the operations side would be noted. This would be referred to as a disbursement

sheet. (RR, Vol. 5, p. 26). Therefore, there was not a specific sheet written for a specific resident but rather an accumulation of many residents and one check being written. The disbursement sheet would tell the operations side each individual and the amount applied to that individual's room and board account. Then there would be a trust fund entry for each resident that would show any deposit or withdrawal. (RR, Vol. 5, pp. 26-27). Therefore, there would be money coming in and out of the trust fund. Some of it would be earmarked for room and board to be paid to the operations side. At the same time, money would be coming in on the operations side for various residents that would be used to pay room and board but it would be only from the operations side. If it came in from the trust fund side, a check would be written and signed by someone other than Fuller, and therefore, the money would be put into the operations side. (RR, Vol. 5, pp. 25-28).

Miller in conducting the audit, looked at the account of Thomas Hughes. Mr. Hughes' bill for room and board averaged $3,500.00 per month. (RR, Vol. 5, pp. 34-35). His bill was paid by direct deposit from Medicaid into the operations side. (RR, Vol. 5, p. 35). Glenda Neisler would have handled the computer entries of Thomas Hughes' Medicaid payments on the operations side. (RR, Vol. 5, p. 36). However, Mr. Hughes received a social security disability payment that was deposited into the trust fund. Apparently there was a payment (disbursement sheet) made from the trust

fund to the operations side and it included $8,000.00 being paid on behalf of Thomas Hughes. (RR, Vol. 5, pp. 72-73). In short, $8,000.00 was paid to the operations side as room and board from Mr Hughes and he did not owe $8,000.00 to the facility. The facility had the money in the operations account. (RR, Vol. 5, p. 125).

Miller acknowledged that it was Brentwood that had the excess payment from the trust fund to the operations fund. These funds were in the operations account of Brentwood, an account Fuller could make deposits into but not withdraw or write checks. (Vol. 4, pp. 140-141; RR, Vol. 5, pp. 15-16,125; RR). Glenda Neisler would have entered this transaction on the operations side. (RR, Vol. 4, p. 103). Miller acknowledged that there can be accounting errors in this system. (RR, Vol. 5, pp. 106 -107).

Miller acknowledged that there was no law enforcement forensic accounting of this situation performed. Additionally, Diversicare did not bring in a certified public accountant nor auditor to perform this audit. (RR, Vol. 5, pp. 124-129). The bottom line is that Brentwood got some money out of the trust fund and it was put into Brentwood's operations account. Brentwood had the trust account that it administered on behalf of the residents and it had the operations account. The facility had all of the money and Erica Fuller did not receive any. (RR, Vol. 5, p. 125). Further, by depositing the funds into the operations account, Fuller could not access

-11-

or do anything with the funds. (RR, Vol. 5, pp. 15-16). Miller acknowledged that absolutely no money went into Erica Fuller's possession as all of it was deposited into Brentwood's account. (RR, Vol. 5, p. 125). Further, this is an account (operations side) that Fuller did not have access to and did not write checks on that account. (RR, Vol. 5, pp. 15-16).

Miller acknowledged that she did not find a single check nor any cash that ended up in Erica Fuller's possession. (RR, Vol. 5, p. 127). Brentwood, when it discovered that the check of $8,000.00 was moved from the trust fund and deposited onto Mr. Hughes' room and board on the operations side simply corrected this by an accounting correction and redeposited the funds back on the trust fund side. In short, the money went from the trust fund to the operations account and from the operations account back to the trust fund account. (RR, Vol. 5, pp. 125, 128-129).

Miller, upon whom the entire audit investigation depends, admitted that her audit was based upon her belief and assumption that Whipkey's receipts were correct. For instance, Miller assumed that patient Lawler always paid cash even though Whitkey's receipts were written such that it indicated both cash and check. Nevertheless, Miller believed that patient Lawler's account was really paid with cash because, according to Miller, the Lawler account was always paid with cash. When confronted with Defendants's Exhibit 10, which is a check for patient Lawler in the

exact amount of the receipt, Miller testified as follows:

> Q.    So would you mean to tell the jury something wrong when you said they always paid in cash when we've got right here a check?
>
> A.    No, sir.  It —
>
> Q.    You're wrong, aren't you?
>
> A.    Yes.

(RR. Vol. 5, p. 47).

Even further when questioned about her lack of experience in conducting an audit, Miller testified as follows:

> Q.    You don't have the experience to make an audit like this, do you, because you missed the most basic thing.  You based your whole audit that that is cash, cash, and right there in your own records is a check.
>
> A.    Yes, sir.
>
> Q.    You missed it, didn't you?  You just flat missed it, didn't you?
>
> A.    That is a check from May of 2010.

(RR, Vol. 5, pp. 47 - 48).

When Miller was questioned about the end result of the questioned transaction, the following testimony was provided:

> Q.    So I have been saying if for a day and a half, there's no money going into her pocket.  It went from one account to the other account and Brentwood is the one that has the money, right?

A.     It was deposited into Brentwood's operating account.

(RR, Vol. 5, p. 125).

Further, Miller's testimony was as follows:

Q.     Did you find a single check that Erica Fuller ever took and - or maybe made up a stamp: "for deposit only" to Erica Fuller?

A.     No, sir.

Q.     Did you find anything like that?

A.     No.

Q.     But you are the auditor, right?

A.     Yes.

Q.     You can't find one penny that went into her account, can you or name or **anything else**.  Right?

A.     I never reviewed her accounts, no.

(RR, Vol. 5, p. 127).

Fuller was fired by Diversicare.  (RR, Vol. 5, p. 107).  Fuller then filed for unemployment benefits and a contested hearing was held before the Texas Employment Commission who determined that "no misconduct established".  (RR, Vol. 4, pp. 174-183).  Thereafter, Fuller filed a suit that was later  transferred to federal court.  (RR, Vol. 4, pp. 175-176, 217, 224, 229).  Diversicare was represented by Matt Holley, who is an employment and labor specialist with Haynes and Boone

-14-

law firm. (RR, Vol. 4, pp. 211-211, 213). Fuller subjected herself to full discovery in the federal court case. (RR, Vo. 4, p. 212). Diversicare did not file any compulsory counter-claim against Fuller. Diversicare settled with Fuller for a total payment of $16,000.00. (RR, Vol. 4, p. 219).

The State argues that Brentwood did not have any problems with their trust funds subsequent to the firing of Fuller. However, the record shows that substantial changes were made to the system subsequent to these events. Specifically, Brentwood changed its receipting system after Fuller was terminated. (RR, Vol. 4, p. 67). Additionally, Brentwood changed the posting side of the system. (RR, Vol. 4, p, 94). Further, they simply do not do receipts the way they previously did. (RR, Vol. 4, p. 110). Administrator Brown acknowledged that the system had been changed "quite a bit". (RR, Vol. 4, p. 165). Further, the procedures were initiated to take care of the problems that Whipkey had as receptionist. (RR, Vol. 4, p. 186). Now under the system that is used, when there is a receipt given, it can be determined from whom and by whom and the manner of the payment. (RR, Vol. 4,p. 263).

## SUMMARY OF THE ARGUMENT

The evidence was legally insufficient to support the jury's verdict. The relevant standard for judging the insufficiency of the evidence is whether after

-15-

viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Adelman v. State*, 828 S.W.2d 418 (Tex.Crim.App. 1992). In other words, there must be evidence of each of the essential elements of theft in the record to such a level that a jury could have found that proof was established beyond a reasonable doubt.

The following conclusively establish facts that make it clear that as a matter of law, the elements of theft simply are not established by any standard, much less, beyond a reasonable doubt:

1.  Fuller was a bookkeeper for Brentwood and, as such, routinely made deposits and disbursements from the trust account into the operations account. (RR, Vol. 4, pp. 179-180; RR, Vol. 5, p. 25);

2.  It was not unusual for residents to have deposits into the trust account which were then paid into the operations account of Brentwood. (RR, Vol. 4, pp. 179-180; RR, Vol. 5, p. 21);

3.  Fuller could make deposits into the operations side but could not perform any other tasks with the operations account. (RR, Vol. 5, pp. 15-16);

4.  Fuller apparently made a disbursement from the facility's trust account into the operations account and this included funds of a resident named

-16-

Thomas Hughes.  (RR, Vol. 5, pp. 72-73);

5. The disbursement was deposited into the operations account of Brentwood.  (RR, Vol. 5, pp. 72-73, 125);

6. Fuller had no control or access to the funds once deposited into the operations account.  (RR, Vol. 4, pp. 103, 140-141; Vol. 5, pp. 15-16, 125);

7. The auditor (Miller) for Brentwood admitted the Thomas Hughes' funds described above were placed into the operations account and were still in the operations account when this controversy came about.  (RR, Vol. 5, p. 125);

8. These funds were not and could not be accessed by Fuller.  (RR, Vol. 5, pp. 15-16, 125);

9. All of Thomas Hughes' funds were still in the account and were returned to the trust account.  (RR, Vol. 5, pp. 125, 128-129);

10. The auditor could not find any money that had ended up in Fuller's possession.  (RR, Vol. 5, p. 127).

To constitute theft, there must be some fraudulent taking of the property. *Rosenbush v. State*, 136 Tex.Crim. 50 (1938).  The authority cited by the State in its brief is not applicable to the present situation.  Fuller, as part of her normal duties,

made disbursements from the trust account to the operations account. It was routine practice and part of her job duties to make such transfers. The complaint in this matter is that Thomas Hughes' money was transferred into Brentwood's operations account. Even if that transfer was in error, wrong, mistaken, or whatever the situation may be, it is not a crime if Fuller did not have control over those funds after they were deposited into the operations account. Fuller did not exercise any control once the funds were put into the operations account and further she could not. It is inconsistent to accuse one of theft and then argue the artifice of theft was that she put funds in the one place that she had absolutely no way of accessing.

The audit and bookkeeping of Brentwood was flawed as was shown by the testimony. The audit was based on assumptions of cash receipts when in fact they were checks and the audit was based on records kept by the receptionist Whipkey, which were almost universally done incorrectly. The only thing the auditor clearly established is that the disputed funds never left the facility and were in the operations account that was under the control of Brentwood, and not under the control of Fuller. As such, the essential elements of theft not only were not proven by a reasonable doubt, but were actually conclusively established otherwise.

*Huff v. State*, 897 S.W.2d 829 (Tex.App. - Dallas 1995) provides the rule for analyzing employee theft. In *Huff*, the company bookkeeper moved funds and

exercised control for her own benefit. She used the funds to pay her personal credit card and, at that point, she was exercising unauthorized control over the property and was guilty of theft. No such situation exist in regard to Fuller. Fuller moved the funds as per her job but she did not, and could not, thereafter exercise control, take possession, or in any way personally benefit from the transaction. At most, it was a clerical error and, at worst, negligent bookkeeping. However, such a mistake or situation does not rise to even arguable criminal conduct. In short, there can be no crime of theft, when you do not have the possession of the funds or even the hope of having the possession of the funds.

## ARGUMENT AND AUTHORITIES

A person commits theft if he unlawfully appropriates property with the intent to deprive the owner of the property. *Tex.Cr.Code Ann § 31.03(a)*. Appropriate is generally defined as meaning:

(A)   to bring about a transfer or purported transfer of title to or other repossessory interest in property, whether to the actor or another; or

(B)   acquire or otherwise exercise control over property other than real property. *Tex.Penal Code § 31.01*.

In cases alleging theft of property by an employee, theft generally is established by showing the employee did not have the authority to dispose of or appropriate the

-19-

property in the manner alleged. *Huff v. State,* 897 S.W.2d 829 (Tex.App. - Dallas 1995). Therefore, theft is established by showing that the employee acted in some way inconsistent with his lawful authority. *Freeman v. State*, 707 S.W.2d 597 (Tex.Civ.App. 1986). When the employee decides to unlawfully and permanently deprive the lawful owner of the property, he is acting in an unauthorized capacity and has committed theft. *Huff v. State,* supra. On the other hand, theft does not occur until an employee acts in some way inconsistent with his or her unlawful authority. *Newman v. State*, 115 S.W.3d 118 (2003). In summary, unlawful appropriation occurs at that moment in time when the employee breaches the trust that the employer placed in him/her. The line between lawful and unlawful activity by an employee, is therefore, a question of the employee's scope of authority. *Newman v. State*, supra.

In the present case, Fuller was indicted for the theft of Thomas Hughes' money. However, the record does not demonstrate that Fuller handled his funds other than transferring into her employer's operations account to which she had no access. Part of Fuller's job including making deposits of patient's money into the trust account. (Vol. 4, p. 47). Fuller's job included disbursing money from the trust account and depositing into the operations account. Fuller made a disbursement from the trust fund into the operations account of Brentwood. Fuller actually wrote the checks but someone else signed. (RR, Vol. 5, pp. 25-28). Fuller could make deposits into the

operations account but had nothing to do with the account thereafter. (RR, Vol. 4, p. 46; RR, Vol. 5, pp. 15-16). Fuller's job was to deposit trust money into the operations account from time to time. Numerous residents had money that came into the trust account and was thereafter transferred into the operations account to pay for items such as room and board owed to Brentwood. (RR, Vol. 4, pp. 178-179). Since this was Fuller's job to make such transfers she was acting within the scope of her employment in so doing. Fuller's job was to transfer in just this manner. Once the funds went into the operating account, Fuller had no access whatsoever. (RR, Vol. 5, pp. 15-16) Only Neisler or a corporate representative had access to the funds in the operations account. (RR, Vol. 4, p. 46). Hence, the funds were still there after this controversy ensued. (Vol. 5, pp. 125, 128, 129).

Obviously, the transfer of funds as it was being moved into the operations account was noted to be in the name of Thomas Hughes along with many other residents. If Hughes did not need this money to pay his room and board as was represented during the trial, then he clearly would have had a credit in the operations side of Brentwood's books. Regardless, Fuller would have had no control and no access and no means of acquiring the money once it went into the operating account. This very act of placing the money in an account to which she had no access shows not only a lack of appropriation but no intent to do so as well. Regardless, Fuller

would have had no control and the money was not lost, and if operations did their accounting properly, Hughes would certainly have had a credit and as such, Hughes did not and could not have lost the money.

Therefore, Fuller had no ability to appropriate these funds. As the Diversicare's auditor acknowledged, Thomas Hughes' funds were never taken by Fuller. (RR, Vol. 5, p. 125). These funds were at all times in Diversicare's operations account and never accessed by Fuller. (RR, Vol. 5, pp. 125-128).

The State appears to ignore the fact that it alleged that Fuller stole Thomas Hughes' money. Yet the Defendant had absolutely no ability to take Thomas Hughes' money from the operations account, and in fact, the same was never used or taken by either Fuller or anyone else. (RR, Vol. 5, pp. 125-129).

The State discounts the reasoning in *Rosenbush v. State*, 136 Tex.Crim. 50 (1938) citing *Minter v. State,* 26 Tex.App. 217, 9 S.W. 561 which contained the following reasoning:

> "To constitute theft there must be a fraudulent taking of the property and while there may be a taking of the property without actual manual possession of it, still the property must in some manner have come into the possession of the party accused of the theft, either actually or constructively, or he cannot be said to have taken it..."
> We have found no authority which holds that mere wounding of an animal upon its range and the pursuit of it without capturing it, without bringing it in some way under the control and dominion of the party is sufficient to constitute a taking.

The State discounts the above reasoning, citing *Stewart v. State*, 44 S.W.3d 582 (Tex.Crim.App. 2001). In *Stewart*, the complainant's ex-husband was threatening to distribute nude pictures of her if she did not pay him. The complainant went to the police who set up a sting operation. Money was put in an envelope and delivered to the Defendant's mailbox. Twenty minutes later the defendant was arrested with the money. However, the State ignores one part of *Stewart*. The defendant was arrested with the money!

This very point of the *Stewart* case is discussed and made clear in *Tesoro Refining & Marketing Co., LLC v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania,* - F.Supp. 3d - 2015 WL 152943. In this case, Tesoro was suing its insurance company for employee theft. Tesoro, an oil refiner, was selling oil to Emmex, an oil distributor. Ennex's debt to Tesoro continued to grow. Tesoro's credit manager, however, manipulated documents such that it improved. Ennex had millions in a letter of credit. The credit manager forged a security agreement from Ennex to Tesoro. When Tesoro attempted to act on the letter of credit for payment of the debt, it learned that the document was forged by its credit manager. Tesoro made a claim for employee theft on its insurance policy which was denied. The Court found no theft citing and distinguishing the reasoning of *Stewart* as the credit manager ultimately did not control the fuel. The credit manager's forgeries did not

transfer possession or control of the fuel - the fuel was transferred only upon its subsequent sale by Tesoro to Ennex.

Applying this reasoning to the present case, Hughes' money came under the control of Fuller's employer, Brentwood. Fuller may have transferred Hughes' money from the trust account to the operations account but at all times, it remained under the control of Brentwood. Fuller did not remove it from Brentwood's control. In fact, Fuller had absolutely no control over Hughes' money when it was deposited into Brentwood's operations account. Hughes' money was not depleted or taken by either Fuller or Brentwood but was simply transferred back to the trust account. At all times, Brentwood maintained control of Hughes' money.

The significance of the defendant employees actually obtaining the funds is demonstrated in *Huff v. State*, 897 S.W.2d 829 (Tex.App. - Dallas 1995). There the defendant was her employer's bookkeeper. One of her jobs was to pay the employer's expenses. When an account became overdrawn, it was determined that the defendant bookkeeper had written company checks to pay the defendant's own American Express bills. Citing the previously stated law concerning employee theft, the Court reasoned as follows:

> "As the company bookkeeper, appellant had a right to possess and to a certain extent, control the company's checks. However, once appellant decided to use the checks for her own benefit rather than for the benefit of the company, her

control over the checks (and the funds they represented) could no longer be considered consensual. As noted previously, when an employee or fiduciary decides, for whatever reason, to unlawfully and permanently deprive the lawful owner of its property, the employee/fiduciary is then acting in an unauthorized capacity i.e. she is then exercising unauthorized control over the property and has committed theft.

Again, in *Huff,* the defendant actually got the money. Again, in the present case, Fuller's job included transferring funds from the trust account to the operations account although she did not actually sign the check. It was within the scope of her authority to prepare disbursement sheets. However, once the funds were disbursed, Fuller thereafter had absolutely no control or access to the funds. Fuller had absolutely no ability to take it from the operations account. She could not and did not take any of Hughes' money from the operations account. In fact, none of his funds were ever taken. His money was always at the facility. It had merely been moved from one account to another. Erica Fuller never took it and by placing it in the operations account, had no control over it.

Exercise of control was further discussed in *Bailey v. State,* 855 S.W.2d 193 (Tex.App. - Dallas 1994). In *Bailey*, the Summa Corporation, a New Mexico corporation, was searching for investment opportunities when it came into contact with an investment specialist. Ultimately, defendant convinced Summa to open up an account over which the defendant did not have signature authority but his

operatives did. The operatives were defendant's wife and the wife's best friend. Defendant then set up a Texas corporation under the name of Summa and set up a bank account for it. He then had his operatives transfer the money to this account. Defendant argued that the evidence was insufficient to demonstrate appropriation. However, the Court found appropriation as the defendant had orchestrated the transfer of funds to his newly created Texas corporation Summa's account and defendant had the <u>sole</u> signator authority over this account.

Evidence in a theft prosecution must further show that the accused intended to deprive the owner of the property at the time the property was taken. *Wirtz v. State*, 361 S.W.3d 694 (Tex.Crim.App. 2012). In determining whether the defendant had criminal intent to commit theft, the Court may consider whether the defendant experienced personal gain from the property obtained from the complainants. *Christensen v. State*, 230 S.W.3d 75 (Tex.App. - Houston [1st Dist.] 2007). As previously set forth, Fuller never received any of Hughes' money and could never have received any of Hughes' money. Moreover, the intent to deprive must be for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner. *Penal Code § 31.01*. Again, Hughes never lost the enjoyment or use of his property. It never left the Brentwood accounts. It always remained there for his use and benefit.

## Consciousness of Guilt

Finally, the State argues that Fuller's concern that a new administrator might fire her demonstrated consciousness of guilt. Generally, any conduct on the part of a person accused of a crime **subsequent** to its commission, which indicates a consciousness of guilt may be received as a circumstance lending to prove that he committed the act with which he was charged. *Cueva v. State*, 339 S.W.2d 839 (Tex.App. - Corpus Christi 2011). [emphasis added].

The State argues that Fuller acted figidity around administrator Brown and inquired as to whether she was going to be terminated. First of all, for the acts to be consciousness of guilt, they must be subsequent to the alleged offense. Brown was hired as administrator in August 2010. (RR, Vol. 4, p. 134). Fuller's comments and actions were immediately after Brown started in August 2010. (RR, Vol. 4, p. 135). Brown described the acts as follows:

Q. Okay. Did Ms. Fuller work at Brentwood before you started in August of 2010?

A. Yes, she did.

Q. So describe your <u>first</u> <u>contact</u> with her when you started working at Brentwood. Was there anything that stood out in your mind?

A. There was. I know that when I first started there, she had come into my office actually on a couple of occasions and asked if I was going to fire her. (RR, Vol. 4, p. 135).

The alleged theft was on December 31, 2010. The conduct so described by Brown was five months **before** the alleged theft so it does not qualify as subsequent conduct.

Regardless, this is not the sort of evidence to which consciousness of guilt typically is applied. This is not flight from a crime or things of that sort. This is being nervous around a new supervisor. If you accept the State's argument that Fuller was figidity because she was aware that her wrongdoing would be exposed, then you would have to ignore the very facts that were demonstrated in the record, not to mention the fact that the alleged conduct had not yet occurred.

Would a person with consciousness of guilt after being terminated file a claim with the Texas Employment Commission and subject themselves to an unemployment hearing? Fuller did so and the commission found no evidence of misconduct. (RR, vol. 4, p. 174).

Further, Fuller hired an attorney and filed a lawsuit against Diversicare. Diversicare hired a world renowned law firm, Haynes & Boone, with a specialist in labor and employment law, Matt Holley, to defend Diversicare. The lawsuit was removed to federal court. Fuller was under the rigorous disclosure requirements of federal court as well as being subject to discovery in a federal lawsuit. This sort of

action would certainly fly in the face of any inference as to consciousness of guilt. Fuller was subjecting herself and laying her situation open to an experienced labor and employment law specialist to inquire in any way he saw fit. Rather, Diversicare with its highly experienced lawyer, settled and paid Fuller $16,000.00. There is no rational set of facts by which consciousness of guilt could possibly be inferred except on the part of Diversicare.

## Sufficiency of the Evidence

The trial court found that the evidence was legally insufficient to support the verdict of the jury. The relevant standard for judging the insufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Adelman v. State*, 828 S.W.2d 418 (Tex.Crim.App. 1992). The evidence is sufficient under this standard only if the State has affirmatively proven each of the essential elements of the evidence. *Gold v. State*, 736 S.W.2d 865 (Tex.Crim.App. 1987).

Under this process, the appellate court recognizes the trier of fact role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence, and on review, the appellate court determines whether the necessary inferences made by the trier of fact are reasonable, based upon the

cumulative force of all of the evidence. *Adames v. State,* 353 S.W.3d 854 (Tex.Crim.App. 2011). An appellate court will conduct constitutional review of the sufficiency of the evidence by measuring the evidentiary sufficiency with explicit reference to the substantive elements of the criminal offense as defined by state law. *Adames v. State*, supra. In this situation, there is absolutely no evidence or inference upon which a rational trier of fact could have concluded that there was proof of the essential elements of theft beyond a reasonable doubt. As shown above, Fuller, in transferring the funds into the operations account, essentially put the funds in the one place she had absolutely no control and absolutely no way or hope of ever receiving control of any money that was in the operations account. Once the money went into the operations account, she had absolutely no ability to access that account and never would be able to do so. The very fact that the money was put into the operations account negates that there was any intent to commit a theft. Certainly by putting it into the operations account, both elements of intent and appropriation are not established beyond a reasonable doubt.

By placing the money in the operations account, any intent is negated. Fuller had no access to the funds in the operations account. Secondly, by placing them into the operations account, not only is intent not established but the appropriation element of the theft cannot be established. In short, Fuller had absolutely no control

of the funds.

Secondly, there was no forensic accounting that was performed by law enforcement in this matter. There was no audit by a trained auditor in this matter. The entire case of the State rests upon the audit of Miller who was neither trained nor educated to perform audits of this type. In fact, Miller admitted that she made assumptions based upon the record keeping of Whipkey. Whipkey, as the receptionist, essentially made incorrect entries on almost every receipt that was made during this time period. Miller made assumptions that payments were made in cash when that was absolutely demonstrated not to be the case. (RR, Vol. 5, p. 45). Miller testified as follows:

> Q. You don't have the experience to make an audit like this, do you, because you missed the most basic thing. You based your whole audit that that is cash, cash, and right there in your own records is a check.
>
> A. Yes, sir.
>
> Q. You missed it, didn't you? You just flat missed it, didn't you?
>
> A. That is a check from May of 2010.

(RR, Vol. 5, pp. 47 - 48).

> Q. Did you find a single check that Erica Fuller ever took and - or maybe made up a stamp: "for deposit only" to Erica Fuller?
>
> A. No, sir.

Q.    Did you find anything like that?

A.    No.

Q.    But you are the auditor, right?

A.    Yes.

Q.    You can't find one penny that went into her account, can you or name or **anything else**.  Right?

A.    I never reviewed her accounts, no.

(RR, Vol. 5, p. 127).

The above shows the audit to be so suspect that no rational trier of fact could have based any inference of guilt on the above.

Miller as the financial specialist for Brentwood clearly establishes that the funds never left the facility and that Fuller had absolutely no control over the funds that were in the operations account.  As such, as a matter of law, no rational trier of fact could have concluded that there was evidence beyond a reasonable doubt.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Appellant Erica Lynn Fuller prays that the above-styled and numbered cause be set for oral argument, and that upon final submission, this Court affirm the trial court's judgment in all respects, and

for such other and further relief, both at law and in equity, to which she may be justly and legally entitled.

Respectfully submitted,

THE MOORE LAW FIRM, L.L.P.

BY:/s/ James R. Rodgers
   James R. Rodgers
   State License #17136300
   Judy Hodgkiss
   State License # 17136525
   100 North Main Street
   Paris, Texas 75460-4222
   Telephone 903/784-4393
   Facsimile 903/783-0042
   Email: jrodgers@moorefirm.com
ATTORNEYS FOR APPELLEE,
ERICA LYNN FULLER

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure, the Brief of Appellee was a computer-generated document and contains 7,339 words, not including the Appendix, if any. The undersigned attorney certifies that he relied on the word count of the computer program, which was used to prepare this document.

s/James R. Rodgers
James R. Rodgers
jrodgers@moorefirm.

## CERTIFICATE OF SERVICE

I certify that a true copy of the above document was delivered to all attorneys of record/parties, in accordance with the Texas Rules of Appellate Procedure this 5th day of August, 2015.

/s/ James R. Rodgers
James R. Rodgers
jrodgers@moorefirm.com